IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DANIEL L. ARZUAGA-RIVERA,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

CIVIL NO. 11-1827 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

This is a tort action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., ("FTCA") brought by Daniel L. Arzuaga-Rivera, a former inmate who alleges to have suffered damages when he slipped and fell in a flooded cell and prison guards ignored his request for medical attention (Docket No. 54 at p. 2; Docket No. 58 at p. 4). The United States denies liability. After a bench trial, having carefully considered all testimony and exhibits and studied the parties' arguments in light of applicable law, the court concludes that plaintiff did not establish by a preponderance of the evidence that the United States was negligent. In consequence, the case must be DISMISSED.

## I.     PROCEDURAL BACKGROUND

On August 22, 2011, plaintiff initiated the action against the "U.S. Federal Bureau of Prisons" ("BOP") and ten unnamed defendants, including MDC-Guaynabo's Administrator, Director of Security, Superintendent, Commander of the Guards, Sergeant, and Correctional Officers, seeking $1 Million in damages under the FTCA; the Fifth, Eighth, and Fourteenth Amendments; 42 U.S.C. § 1983; Article II §§ 1, 7, 12, and 19 of the Constitution of Puerto Rico;

Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142; and the Organic Act of the Corrections Administration of Puerto Rico, Law No. 116 of July 22, 1974, 4 L.P.R.A. § 1101 et seq. (Docket No. 1).  On December 7, 2011, he filed an Amended Complaint to include the United States as a defendant (Docket No. 11).  On May 14, 2012, the United States filed a motion to dismiss for failure to prosecute (Docket No. 20), which plaintiff opposed on May 30, 2012 (Docket No. 21), and the court denied on September 28, 2012 (Docket No. 22).

On October 25, 2012, the United States presented a motion to dismiss for lack of subject matter jurisdiction; failure to properly serve the Attorney General and the United States Attorney within the time limit set by Fed.R.Civ.P. 4m; lack of service on the unnamed defendants; lapse of the limitations period; erroneous reliance on Section 1983 to sue federal employees; qualified immunity; and failure to exhaust administrative proceedings (Docket No. 25).  On November 29, 2012, plaintiff opposed the dismissal request, waiving the claims against the unknown defendants (Docket No. 27).  On August 6, 2013, the court denied the motion to dismiss in part as moot (Docket No. 52), dismissing with prejudice all claims except the tort claim against the United States under the FTCA (Docket No. 55).

On July 7, 2013, the United States filed a motion for summary judgment, arguing there is no evidence to support plaintiff's claim (Docket No. 50).  On August 13, 2013, plaintiff opposed the motion (Docket No. 53), and on August 19, 2013, filed a Second Amended Complaint against the United States under the FTCA, Article II §§ 1, 7, 12, and 19 of the Constitution of Puerto Rico; Articles 1802 and 1803 of the Puerto Rico Civil Code, supra; and the Organic Act of the Corrections Administration of Puerto Rico, supra (Docket No. 54).  On December 20, 2013, the court denied the motion for summary judgment (Docket No. 100).

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 3

In the meantime, on May 22, 2013, plaintiff filed a motion to compel discovery (Docket No. 37), which the United States opposed on June 24, 2013 (Docket No. 47). Plaintiff replied on June 24, 2013 (Docket No. 47). On June 21, 2013, the United States requested the exclusion of plaintiff's expert witness, and in the alternative, a Daubert hearing (Docket No. 46), which plaintiff opposed on July 5, 2013 (Docket No. 49). Plaintiff replied on July 5, 2013 (Docket No. 49). On September 24, 2013, the court found moot the motion to compel discovery (Docket No. 60).

On October 15, 2013, plaintiff filed a motion *in limine* (Docket No. 68), which the United States opposed on October 25, 2013 (Docket No. 85). On October 18, 2013, the United States filed a first motion *in limine* as to medical causation (Docket No. 71), and a second motion *in limine* regarding maintenance issues in the special housing unit (Docket No. 72), which motions plaintiff opposed on October 28, 2013 (Docket Nos. 86 and 87). On October 29, 2013, the United States moved to strike plaintiff's oppositions to the *in limine* motions (Docket No. 88).

On October 30, 2013, plaintiff opposed the United States' request (Docket No. 89). On November 8, 2013, the court denied the request to strike (Docket No. 96); on August 22, 2014, it denied without prejudice the motion *in limine* regarding causation (Docket No. 113); and on September 9, 2014, it denied without prejudice the motion *in limine* regarding maintenance (Docket No. 114). On September 9, 2014, the court set trial for February 2, 2015 (Docket No. 115). In light of plaintiff's counsel's previous trial engagement, on December 11, 2014, trial was vacated (Docket No. 125), and on May, 2, 2016, it was reset for August 12, 2016 (Docket No. 162). Trial was held as scheduled on that date. Plaintiff presented two witnesses. The United States presented four witnesses. The parties jointly submitted thirteen exhibits, and on September 2, 2016, filed post trial briefs (Docket Nos. 204 and 205).

<u>Arzuaga-Rivera</u> v. <u>United States of America</u>
Civil No. 11-1827 (PAD)
Opinion and Order
Page 4

## II.    LEGAL FRAMEWORK

As a sovereign nation, the United States is generally immune from tort liability except to the extent that it consents to be sued. <u>Dynamic Image Technologies, Inc.</u> v. <u>United States</u>, 221 F.3d 34, 39 (1st Cir. 2000). The FTCA comprises a limited waiver of federal sovereign immunity, which allows the government to be held liable for certain tortious acts and omissions. <u>Limone</u> v. <u>United States</u>, 579 F.3d 79, 88 (1st Cir. 2009). To that end, it requires that liability be assessed in accordance with the law of the place where the act or omission occurred. <u>Scanlon</u> v. <u>Department of the Army</u>, 277 F.3d 598, 600 (1st Cir. 2002). MDC-Guaynabo, where plaintiff claims to have been injured, is located in Puerto Rico. For the same reason, Puerto Rico law must be looked into to assess plaintiff's claim.

Plaintiff alleges that he suffered damages when he slipped and fell in flooded prison cell, and prison guards ignored his request for medical attention (Docket No. 54 at p. 2; Docket No. 58 at p.5). Article 1802 of the Puerto Rico Civil Code, Puerto Rico's general tort statute, provides in part that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. Laws Ann. tit. 31 § 5141; <u>Calderón-Ortega</u> v. <u>United States</u>, 753 F.3d 250, 252 (1st Cir. 2014). In turn, Article 1803 of the Civil Code, P.R. Laws Ann. tit. 31 § 5142, applies the principle of *respondeat superior* to Article 1802 claims. See, <u>Pagán-Colón</u> v. <u>Walgreens of San Patricio, Inc.</u>, 697 F.3d 1, 15 n.8 (1st Cir. 2012)(so noting).[1]

To prevail, a plaintiff must show: (i) that defendant acted with fault or negligence; (ii) damages; and (iii) a causal connection between the fault or negligence and the damages. See,

---

[1] Pursuant to Article 1803, the owner of an establishment or enterprise is liable for damages caused by the fault or negligence of its employees in the course of their employment or on account of their duties. See, <u>Burgos-Oquendo</u> v. <u>Caribbean Gulf Refining Corp.</u>, 741 F.Supp. 330, 333 (D.P.R. 1990)(discussing scope of owners's liability under Article 1803). The employees' actions must have been within the scope of their employment or in the protection of the employer's interests. <u>Id.</u> n.3.

Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007)(so explaining)(citing Torres v. KMart Corp., 233 F.Supp.2d 273, 277-78 (D.P.R. 2002). In claims based on allegedly dangerous conditions, plaintiff must prove that a dangerous condition existed which caused his injury, and that defendant had either actual or constructive knowledge of the condition and took no corrective action. Nieves-Romero v. United States, 715 F.3d 375, 378-379 (1st Cir. 2013).

To establish constructive knowledge, a plaintiff must show either the existence of the dangerous condition for an unreasonable or excessive length of time or, in the absence of evidence regarding time, the owner's insufficient prevention policy or failure to implement the policy. See, Ramos-Rosado v. Wal-Mart, 165 D.P.R. 510, 513-515 (2005) ("Neither did [plaintiffs] show that the alleged substance was on the floor for an unreasonable or excessive length of time or that the defendant failed to implement the prevention policy established in its stores"). Viewing the record as a whole, there is no evidence that the United States had actual or constructive knowledge of a dangerous condition in the cell that plaintiff was assigned to on the day that the event allegedly occurred, or that plaintiff was not given medical care.

### III.    FACTUAL FINDINGS

#### A.    Facilities

1.    MDC-Guaynabo is a Federal detention facility located in Guaynabo, Puerto Rico. Plaintiff was an inmate in MDC-Guaynabo from 2008 to 2010, and from July 2015 until June 2016 (Transcript at p. 5).[2]  Upon entering the facility in 2008, he was assigned to the general population.

---

[2] Plaintiff was sentenced to sixty-three months in the custody of the BOP and eight years of supervised release for conspiracy to possess with intent to distribute at least twenty but less than thirty-five grams of cocaine base.  Joint Exhibit ("JE") X ("Inmate History") at p. 1.

<u>Arzuaga-Rivera</u> v. <u>United States of America</u>
Civil No. 11-1827 (PAD)
Opinion and Order
Page 6

<u>Id.</u>  In March 2009, he was placed in Unit 4-A, SHU, for possession a dangerous weapon.  JE X at p. 2.  He was in SHU until May 2009, when he went back to the general population.  <u>Id.</u>  He returned on June 17, 2009, after an investigation revealed his involvement in a June 13, 2009 incident which included assaulting another inmate with serious injury.  <u>Id.</u>  He was in SHU through July 30, 2009.  <u>Id.</u>

    2.  While in SHU, plaintiff was assigned to the following cells:

        a.  06/17/09-07/09/09- Cell 121 Lower Bunk

        b.  07/09/09-07/30/09- Cell 118 Lower Bunk[3]

        c.  07/30/09-08/06/09- Cell 115 Lower Bunk

        d.  08/06/09-08/27/09- Cell 107 Lower Bunk

        e.  08/27/09-09/17/09- Cell 112 Lower Bunk

        f.  09/17/09-10/08/09- Cell 108 Lower Bunk

        g.  10/08/09-10/29/09- Cell 111 Lower Bunk

        h.  10/29/09-10/29/09- Cell 101 Lower Bunk.

    3.  JE III ("Inmate History Quarters"), at pp. 1-2.  SHU has two hallways, one to each side, divided in the middle by a wall with doors, with seventeen rooms on each side (Transcript, at p. 179).  Each room has two beds, a toilet, a sink, and a shower.  <u>Id.</u> at p. 8.  The shower has a drainage hole.  <u>Id.</u>  The lower bed is made out of cement, one and a half foot from the floor, out of which four metal posts go up to support a flat bed on top, which is screwed onto the bottom bed.  <u>Id.</u> at pp. 9-10.

---

[3] Plaintiff could not answer the question of what bunk he was assigned to (Transcript at p.20).  He testified that an officer took him to the cell; when he entered the cell, Wilfredo Pinero, a codefendant of his, was sleeping in the lower bunk; that the bunk which is empty is your bunk; and hence, he took the upper bunk.  <u>Id.</u> at pp. 20-21.

4.      The upper bed lacks railings or a ladder.  Id. at p. 10.  It is five feet from the floor.

Id. at p. 11.  To get down from the upper bed, plaintiff would place his feet down first, look at the

bed, pick up his feet, place them on the bottom bed, grasp onto the upper bed, turn around facing

away from the bed, and throw one foot down, followed by the next one.  Id. at pp. 10-12.  From

there, it was a foot and a half to the floor.  Id.

### B.      Correctional Personnel and Inmates

5.      Inmates at SHU customarily interact with correctional personnel during stand-up

headcounts, officer rounds, meal delivery, and medical services.[4]  In a stand-up headcount, inmates

get off their beds and stand in front of their cells with lights on.  Id. at pp. 62-63.  The cell door is

not open.  Instead, officers look through the window.  Id.  If an inmate is not standing for the count,

officers need to verify why he is not standing.  Id. at p. 232.  If the inmate does not stand up for

the count, he is issued an incident report.  Id. at p. 233.  In that case, the inmate must report to the

lieutenant's office.  Id.  In the event the inmate cannot stand for the count, the facility goes into a

medical emergency.  Id.  On weekends, the standup count is conducted from 9:00 a.m. to 10:00

a.m., at 4:00 p.m., and at 10:00 p.m. (Transcript at pp. 60-63).

6.      Separate and apart from headcounts, officers conduct rounds every 30 minutes.  Id.

at p. 227.  During rounds, officers knock on the door, look in through the cell's glass window, and

ask whether the inmates are okay.  Id.  In addition, the SHU lieutenant conducts a round once every

shift, every eight hours.  Id. at p. 228.  Inmates receive meals three times a day: breakfast, lunch

and dinner.  Id. at p. 230.  Meals are delivered cell by cell by two officers.  One opens the cell, one

food slot at a time, to give the inmate his meal.  The inmate must come up and grab his plate, so it

---

[4] Additional interaction may take place during emergency counts (Transcript at p. 218); recreation (id. at pp. 220, 229); and
supervised inmate movements.

can be annotated that he ate.  Id. at pp. 242-243.  The lunch is placed for inmates to pick up in each cell's door between 11:00 and 11:30 a.m.  Id. at pp. 21-22.  As part of the routine, medical personnel goes door to door to each individual cell, making medical services available to inmates at least once a day.  Id. at pp. 178, 237.

### C.   Logbook

7.   Officers in SHU maintain a Unit Log Book, where they write down what happens during the day from the time they assume duties and count up equipment.  They register dates and times, inmate counts, security rounds, disciplinary issues, medical emergencies, and anything that may be broken (such as door windows, lights, fixtures, and flooding).  Id. at pp. 226-227.

### D.   Flooding

8.   The Log Book indicates that on May 6, 2009, at 11:37 a.m., inmates in Cells 112, 113 and 114 flooded their cells (JE IV; Transcript at pp. 245-246).  Those cells are located on the north range, on the opposite side of Cell 118 where plaintiff was.  Id. at p. 246.  Officers shut off the water.  Id. at pp. 246-247.  Similarly, it states that on June 11, 2009 at 6:10 p.m., four inmates flooded the north range.  See, JE IV.  No flooding incidents were reported on July 26, 2009 (Transcript at p. 247).

### E.   Repair Orders

9.   MDC-Guaynabo maintenance records reflect the following repair services from June 26, 2009 to July 30, 2009: June 26, 2009, toilet in Cell 113 and shower in Cell 119, JE VIII at p. 9649; August 4, 2009, can light missing across from Cell 119, and lamp in front of Cell 116, id. at p. 10194; August 7, 2009, clogged toilet on Cell 104 (id. at p. 10217); August 14, 2009, toilet not working properly in Cell 114 (id. at p. 10313); and August 24, 2009, plumbing chase between Cell 113 and Cell 114 leaking profusely.  Id. at p. 10454.

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 9

### F.    Slip and Fall

10.    According to plaintiff, as he was getting off the bunk to get lunch he slipped and fell because the floor was flooded with water (Transcript at p. 22).[5]  He asserted to have received the blow on his back.  Id.  He said he was unable to move and threw himself on the floor.  Id.  He stated that a female officer who was giving out lunch saw him on the floor and that he "told the officer," who allegedly responded that plaintiff knew the protocol and needed to fill out a form for sick call.  Id. at 23.[6]

11.    From plaintiff's account, there is no evidence that the United States either knew or had constructive knowledge of the existence of a dangerous condition in the cell.  The Statement accompanying SF 95 (JE  XIII) and the Second Amended Complaint (Docket No. 54 at p. 2) state the incident occurred in the early morning.[7]  Plaintiff had a visit at 7:50 a.m., and returned to the cell at 9:37 a.m.  Id. at p. 66.  There was a stand up count between 10:30 and 11:00 a.m. where plaintiff had to stand to be counted.  There is no evidence that either he or his cellmate told officers that water had flooded the cell's floor or that there was water on the floor.[8]

---

[5] Plaintiff testified the incident occurred on July 25 or 26, 2009 (Transcript at p. 21).  The court finds that any such incident must have occurred on July 26, 2009.  Standard Form ("SF") 95, the form used to bring a tort claim against the United States, id. at pp. 36-38, asserts that the "accident" occurred on July 26, 2009 (JE XIII at p. 1), and the Second Amended Complaint states plaintiff fell on July 26, 2009 (Docket No. 54 at p.2).  Additionally, visits are on Sundays, and plaintiff had a visit on July 26th, which was a Sunday (Transcript at pp. 42-43).

[6] Plaintiff said he told the officer, in response to the question by his counsel, "[d]id you ask for help?" (Transcript at pp. 22-23).

[7] According to the testimony of BOP Lieutenant Víctor Santana, "early morning" means "like during breakfast" (Transcript at p. 226).

[8] Plaintiff's medical record contains different versions of the incident as reflected in what physicians wrote from information that plaintiff provided.  For August 14, 2009, the record states inmate claimed he had a fall from upper bunk two weeks ago.  JE I at p. 142.  For March 5, 2010, it states that inmate referred history of right thigh area old injury.  Id. at p. 108.  For March 17, 2010, it states inmate has a history of right thigh injury.  Id. at p. 105.  For April 6, 2010, it states that patient had history of back pains, (id. at p.101), and that consultation was requested because patient was with back pains after back injury of 6-8 months evolution.  Id. at p. 102.  For August 2, 2010, it states that plaint had no prior history of back problems until about a year ago that he fell in SHU, the cell was flooded and when he got up to get his food he slipped and fell.  Id. at p. 91.  On August 13, 2010, plaintiff's counsel signed SF-95, stating in the form's attachment that plaintiff woke up, got out of bed and instantly slipped and felon his back, injuring his back and leg; and when he recovered from the fall, he realized that the cell was completely flooded, reason for which he slipped.  JE XIII-Attachment at p. 1.  The United States received the SF-95 on August 26, 2010.  JE XIII at p. 1.  In the

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 10

12.     During trial, plaintiff testified that the incident took place around lunchtime rather than early morning (Transcript at pp. 21-22).  Lunch was distributed after the standup headcount between 11:15 and 11:30 a.m.  Id. at p. 22.  There is no proof that MDC-Guaynabo personnel knew plaintiff's cell was flooded or that there was water on the floor.  Plaintiff said he "told [an] officer," id. at pp. 22-23 but it is not clear what he told her, and certainly he did not testify that he informed that officer or any other officer that the cell was flooded or that there was water on the floor before he allegedly slipped and fell.[9]

13.     Similarly, there is no indication that plaintiff's clothes were soaking wet; that he had to ask for a new uniform; that he had to use his towel to clean up the water that he said was in the floor and on which he had slipped and fell on; that his cellmate had wet socks; or that the cellmate's outfit was wet.  The absence of evidence in that regard is inconsistent with the existence of flooding, for plaintiff stated that when inmates go into SHU, the only thing MDC-Guaynabo gives inmates is one towel, a jumper suit, a t-shirt, boxer shorts, and a pair of socks (Transcript at p. 8).  In the end, there is no testimony or other evidence that MDC-Guaynabo personnel had knowledge or constructive knowledge of any problem in plaintiff's cell on July 29, 2009.

---

note prepared by Dr. Woodbury on May 13, 2011, after plaintiff was transferred to South Carolina at the end of 2010, it states that patient complained of significant pain in his lower back since a fall in June 2009; that at that time, patient was incarcerated in the special holding unit, at the federal facility in Puerto Rico; and an adjacent inmate flooded his cell.  There was water on the floor and patient slipped on the water on the floor, falling backwards onto his back.  JE I at p. 138.

[9] During cross examination, he stated that "the same day that he [fell] there was a [female] officer in front of [his] door who was aware of what had happened" (Transcript at pp. 22, 51).  Nevertheless, the court cannot say with a reasonable degree of certainty what that officer was "aware of."  Plaintiff said that if he was not mistaken, the officer's last name is "González."  Id. at p. 51. But he did not provide a description of what that officer in front of the door purportedly saw, and his testimony is silent on whether he told the officer that the cell was flooded or there was water on the floor at all.

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 11

### G.   Post/Incident

13.   Plaintiff asserted that it was several hours after he told the correctional officer that he had slipped, that "they" brought the sick call document or form to his cell.  He said his cellmate helped him get up, placed him in the lower bed, filled out the form in plaintiff's name, and put the document in the cell's door for officers to pick up.  Id. at pp. 23-24.[10]  He pointed out that after several weeks, "they" went over to his cell to tell him that he should go over to the medical area, but he explained to the guard that he was in pain and could not go out because "they" wanted to handcuff him and have him walk in handcuffs.  Id. at p. 71.  He testified that he could not walk, and that to reach the medical area he would need to walk "quite a bit."  Id. at p. 24.  The medical office is about 20 to 30 feet from SHU.  Id. at pp. 235-236.

14.   Plaintiff's medical record shows that a physician, Dr. José Miró, interviewed him on August 14, 2009 in SHU (JE I at p. 142).  The physician's note indicates that plaintiff related to have fallen from upper bunk two weeks prior, and since then, had right hip and low back discomfort.  Id.  The pain was One in the Pain Scale (Transcript at pp. 143, 163; JE I at p. 142).  In the Pain Scale, ten is intolerable and one is mild or with no pain (Transcript at p. 156).  Mild or minimal pain is what a person could get from sitting for three straight hours.  Id. at p. 157.[11]

15.   The physician's note states that plaintiff refused to be evaluated out of the cell (JE I at p. 142).  If the inmate needs medical service, two officers are required to move him from the

---

[10] The Log Book (JE IV) does not reflect any request by plaintiff on July 26, 2009 for medical treatment.  By contrast, it shows that at 1:55 p.m. an inmate asked to talk to the Psychology Department, and on July 27, 2009, at 9:48 a.m. an inmate requested to speak with her psychologist. In any event, medical department personnel made daily rounds, and, as described by its Director, were prepared to handle inmate health situations and emergencies.  There is no evidence that plaintiff even attempted to speak with the medical staff on July 26, 2009.

[11] MDC-Guaynabo's Clinical Director testified that the pain scale does not add up to a compressed fracture such as plaintiff described to have suffered on July 26, 2009.  Id. at p. 194.

cell to the medical room (Transcript at pp. 178-179).  Both the inmate and his roommate are handcuffed, and the inmate is escorted to the medical room.  Id. at p. 179.  If the patient is acutely ill, orderlies put him on a stretcher, and take him to the infirmary for evaluation.  Id. at p. 165.

### H.      Medical Evaluations & Treatment: Puerto Rico

16.     By October 2009, plaintiff was back in the general population.  Id. at p. 25.  Dr. José Miró evaluated him in MDC-Guaynabo on March 5, 2010, March 15, 2010, April 6, 2010, April 21, 2010, and April 22, 2010.  On March 5, 2010, plaintiff complained to Dr. Miró about an old, right-thigh area injury (Transcript at p. 144; JE I at p. 108).[12]  On March 15, 2010, he complained about muscle/joint ache, with pain location on leg-upper right front (JE I at p. 105). Dr. Miró documented in the record that plaintiff had a history of right thigh injury and had observed a skin depression after the injury, with no disability (Transcript at pp. 144-145; JE I at p. 105).  He reported a normal examination, full motion range, with a Two in the Pain Scale, non-tenderness on palpation, and normal body landmarks.  Id.  Plaintiff had a groove between the muscle mass, a dent between the muscle mass of the right quadriceps (that is, a muscle in the anterior aspect of the thigh, and the abductor muscles, in the front and inner aspect of the thigh), and referred to a history of low back pain without major complaints, the first low-back complaint in the record (Transcript at p. 145).  Accordingly, Dr. Miró requested X-Rays.  Id.

17.     On April 6, 2010, Dr. Miró evaluated plaintiff for back pain (JE I at p. 101), with X-Rays revealing a compression fracture of the lumbar three vertebra of unknown age  and a small disc herniation, compatible with a desiccated disc (Transcript at p. 145, JE I at p. 101).[13]  Dr. Miró

---

[12] In 1997, plaintiff had a mountain bike accident in his father's farm, and stated to have injured his knees (Transcript at pp. 31-32).

[13] A desiccated disc is a disc between the vertebrae (Transcript at p. 146).  It means that the disc has lost its water content, suggesting in a young person 28-30 years of age like plaintiff, a long-standing condition secondary to degenerative disc disease.  Id.  at pp.

ordered an MRI Evaluation (JE I at p. 102); on April 21, 2010, ordered a back brace, which was provided, id. at p. 100; and on April 22, 2010, evaluated plaintiff, noting a Two in the Pain Scale. Id. at p. 98.  Plaintiff did not appear in pain or distress.  Id.   The MRI showed a compression fracture of L3; L4-L5 small central disc herniation, compatible with a desiccated disk, and inflammatory changes (Transcript at pp. 146-147; JE I at p. 94).  The radiologist could not, however, state the age of the fracture (Transcript at p. 147).  He stated that plaintiff had degenerative changes; that is, changes usually due to a long-standing condition.  Id.

18.     In August 2010, Dr. Ada Rivera evaluated plaintiff (JE I at p. 91).  According to Dr. Rivera, plaintiff reported a prior history of back problem from about a year prior, when he fell in SHU.  More specifically, he stated that the cell was flooded and when he got up to get his food he slipped and fell, landing on his buttocks and hitting his foot against the toilet.  He said he was evaluated through sick call, and that he had been continuously complaining of pain.  Id.  Dr. Rivera noted plaintiff had no problems sitting or standing.  Id.

**I.      Medical Evaluation & Treatment: South Carolina**

19.     In 2010, plaintiff was transferred to Williamsburg Prison in South Carolina to complete his sentence (Transcript p. 28).  On December 28, 2010, he was examined by Dr. David Massa.  Id. at p. 148.  Dr. Massa found a full range of motion in plaintiff's lumbar spine.  Id. Plaintiff walked into the exam room, sat on the table, rose from the table, and walked out to the waiting area with no apparent distress.  Id.  On March 11, 2011, Dr. Mas reevaluated plaintiff in

---

146-147.  The degeneration was secondary to arthritis.  Id. at p. 147.  The MRI showed that plaintiff was a young man with an old man's spine, suggesting a long-standing chronic condition in his back of unknown age.  Id. at p. 147.  The age of the fracture could not be stated.  Id.  There cannot be a fracture of a vertebra and in six, eight months a degeneration of the spine.  Id.

connection with a fracture of the lumbar vertebra.  Id. at p. 149.  He identified full range of motion, non-tender, normal lordosis, normal active and passive range of motion, neurovascular intact.  Id.

20.      On May 13, 2011, plaintiff saw an orthopedic surgeon, Dr. David Woodbury.  Dr. Woodbury's impression was that plaintiff had a healed fracture, lumbar vertebra number three, and that his back pain was secondary to deconditioning.  Id.[14]  He oriented plaintiff about the brace, which plaintiff no longer needed because he would have further deconditioning.  Also, he pointed out the pain was due to plaintiff's limited muscular activity in the back, and gave plaintiff a list of back stretching exercises to perform.  Id.[15]

22.      While in Williamburg, plaintiff was able to walk on a treadmill 20 to 30 minutes; to perform circuit sprint training for 20 minutes; to do push-up burpees for one hour, twice a week (Transcript at p. 150).[16]  Additionally, he was able to do 600 push-ups in sets of 30, that is, 30 sets of 20, which one take probably one morning (id. at pp. 150-151); 15 pull-ups (id. at p. 151); 20 sets of Navy seal push-ups (id.);[17] and 30 sets of 25 abdominals.  Id.

**J.      Expert Witnesses**

23.      Plaintiff presented the testimony of Dr. Eric Javier, a physiatrist (Transcript at p. 76).  The United States presented the testimony of Dr. Carlos Grovas, an orthopedic surgeon.  Id. at pp. 141-142.  Dr. Javier assigned a six percent permanent disability to plaintiff.  Id. at p. 81.  In

---

[14] Deconditioning refers to the muscular atrophy that develops when a patient keeps a brace for any length of time.  Transcript at p. 149.

[15] As plaintiff described his interaction with the doctor, the orthopedist said there were no stronger medications, and the only thing that could relieve plaintiff's pain was reduce weight and exercise to strengthen the back lumbar muscles.  Id.  Plaintiff can do all sorts of exercises, except jumping, like rope jumping or jumping jacks, because the impact is felt in the lower back.  Id.  Plaintiff indicated that still to this day, he still has pain, and even though he continues doing the back exercises, he cannot do any sudden movements or lift heavy things.  Id. at p. 29.

[16] Push-up burpees are push-ups followed by a jump, and then down again for the push-up.  Id. at p. 149.

[17] Navy seal push-ups are push-ups done with just one extremity behind your back.  Id. at p. 151.

Dr. Grovas' opinion, plaintiff has no whole person impairment.  Id. at p. 155.  For him, there is no residual impairment due to the lesion, whenever it occurred.  Id. at pp. 153-154.  The court credits Dr. Grovas' conclusion.

24.     Both expert witnesses conducted a physical examination of plaintiff, finding the examination within normal limits (Transcript at pp. 82, 152).  Plaintiff had a full range of motion with no deficit.  Id. at p. 153.  Confronted with the range of exercises plaintiff performed while incarcerated in South Carolina, Dr. Javier could not recall if he had been able to review plaintiff's BOP recreational record.  Id. at p.115.  As to the exercises as such, he indicated that he would need to know if plaintiff reported any pain, what was the frequency of the exercises, and how much it took plaintiff to do the exercises.  Id. at pp. 104-105.  He stated that he adjudicated the impairment because plaintiff is going to develop degenerative changes (id. at p. 88), and as long as plaintiff had symptoms, he had to adjudicate six percent of permanent disability even if plaintiff had received top notch treatment.  Id. at pp. 99-100.  Dr. Mojica, the United States' original expert witness, had assigned that percentage as well.  Id. at p. 162.  He passed away, and could not testify.  Id.  However, he was a neurologist and there is no explanation in the record for his conclusion. Id.

25.     Dr. Grovas observed that the degeneration was secondary to arthritis, id.  at p. 147; that the MRI shows that plaintiff is a young man with an old man's spine, which suggests a long-standing chronic condition in his back of unknown age; and that there cannot be a fracture of a vertebra and in six, eight months a degeneration of the spine.  Id.  Even though plaintiff reported some thigh pain in March 2011 and back pain could radiate into the thigh, it occurs if you have a neurological deficit, but nobody has found a neurological deficit in plaintiff.  Id. at p. 171.  Dr. Woodbury described the fracture as a healed L3 compression fracture.  JE I at p. 139. While

testifying, plaintiff showed no signs of pain even though he was seated for about one hour.  Id. at

p. 153.  Dr. Javier did not comment on that fact.

## IV.   DISCUSSION

### A.   Flooding

Plaintiff alleges that he woke up in his cell –there is some dispute as to what time it was –

lowered himself off the bed, and as he hit the floor, slipped on water, suffering a compression

fracture.  The incident such as plaintiff has described does not result in liability.  BOP served

breakfast, lunch and dinner every day, the equivalent of two officers walking down the aisle for

that purpose at least three times a day.  There were three headcounts a day, in addition to security

rounds every thirty minutes and medical rounds every day.  Thus, somebody from the BOP walked

down the aisle at least seven times a day.  Yet, there is no evidence that plaintiff or his cellmate

ever informed BOP that there was water on the floor of Cell 118.

From this perspective, it seemed that not even plaintiff knew there was water on the floor

when he jumped off the upper bunk to get the food tray at lunch.  If he did not know there was

water on the floor, it would not be reasonable for the BOP to know there was water on the floor.

There is no evidence by way of testimony or records that BOP otherwise was aware of any flooding

problem or of any problem in plaintiff's cell.  In the work orders identified by the BOP from June

2, 2009 through August 28, 2009, the repairs occurred in cells plaintiff did not occupy, to wit,

Cells 128, 113, 119, 104, and 114.  On these facts, there was no injury linked to fault or negligence

attributable to the United States.

In Nieves- Romero, 715 F.3d at 375, the First Circuit affirmed the dismissal of a complaint

filed by a patient who sustained injuries after falling while attempting to transfer himself from his

wheelchair onto a toilet at the Veterans Affairs Hospital in Puerto Rico.  The patient could not

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 17

show the defendant had knowledge of the dangerous condition.  Hence, the case was dismissed.

In Duarte-Hierro v. United States, Civil No. 12-1057 (D.P.R. March 28, 2013) plaintiff was an

inmate in MDC-Guaynabo.  He slipped and fell due to a puddle of water in front of an ice maker.

Given that he could not prove that the BOP had actual or constructive knowledge of the dangerous

condition, the case was dismissed.  Along the same line, in Calderón, 753 F.3d at 250, plaintiff

was buying some products at the PX in Ft. Buchanan, in Puerto Rico.  She stood in line, walked

forward, slipped and injured herself.  People came around to gather around her, and noticed there

was liquid on the floor.  The cashier said he could not see directly to the other side of the floor

where the water was.  The manager said he walked around the store every 30 minutes to check

safety, but had not seen the liquid.  The case was dismissed.[18]  BOP personnel walked down SHU

at least seven times a day, and there is no indication that anyone told them that in Cell 118, the cell

that plaintiff was in, there was water on the floor.

**B.   Medical Treatment**

Plaintiff has a compression fracture.  But there is no medical evidence as to when it

happened.  No physician was able to identify the onset of the condition, that is, when it occurred.[19]

Based on a pain scale shortly after the incident plaintiff has testified about, the fracture probably

did not occur on July 26, 2009.  And the United States was not oblivious to the conditions that

plaintiff described.

---

[18] See also, Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50-51 (1st Cir. 1997)(dismissing negligence case due to plaintiff's failure to show that defendant had knowledge of the harm-causing condition).

[19] Initially, Dr. Javier stated that he could not say when the trauma happened (Transcript at p. 89).  Then he said that with medical probability, it took place within a year or so from the MRI.  Id. at p. 90.  Subsequently, he testified that the radiologist was unable to tell the age of the fracture, and neither could he.  Id. at p. 117.

A physician saw plaintiff on August 14, 2009 while in SHU with complaints of falling from the upper bunk.  Plaintiff refused to be evaluated out of his cell, even though the medical office was close by.  Plaintiff testified that his cellmate prepared a sick call slip on his behalf, which was placed on the cell's door on July 26, 2009, and it was only weeks later that a doctor stopped by to see him.

Nevertheless, in addition to the headcounts and regular rounds that the correctional officers conducted, medical department personnel made daily rounds, and there is no evidence that plaintiff attempted to speak or spoke to that personnel to complain about pain or the need to see a doctor on July 26, 2009 or at any point thereafter until August 14, 2009.  Nor is there evidence that he refused to take recreation, for which he would have to walk out of the cell in handcuffs (Transcript at pp. 220-221) during that period or any other period while in SHU.  Further, during headcounts plaintiff needed to stand up, id. at pp. 232-233, as otherwise officers would have to verify why he was not standing.  Id.  Plaintiff did not testify that at any point he was unable to stand up for a headcount.

On March 5, 2010, plaintiff was seen for an old right thigh injury.  On March 15, 2010, he reported back pain.  Even though he had a normal physical examination, Dr. Miró requested X-Rays.  On April 5, 2010, the X-ray was reviewed, showing a compression fracture of unknown age.  Plaintiff was given anti-inflammatory medication and a back brace.  And an MRI was requested.  The MRI revealed a chronic anterior wedge compression fracture of L3.  In December 2010, plaintiff was evaluated by a physician following his transfer to Williamsburg, and on May 13, 2011 he was evaluated by Dr. Woodbury, the orthopedic surgeon in Williamsburg.  As soon as plaintiff started exercising, he did well.  Id. at pp. 154-155.  Based on Dr. Grovas' testimony, which the court finds persuasive, plaintiff reached the maximum medical improvement that he

could reach.  His impairment is zero.  Even if that were not the case, any impairment would not be

due to the fault or negligence of the United States.

## V.      CONCLUSION

To prevail, plaintiff must establish that the United States had actual or constructive

knowledge of the existence of a dangerous condition.  He did not do so.  If there was water on

plaintiff's cell, neither plaintiff nor his cellmate told anybody despite the opportunity to do so

through headcounts and regular rounds.  There was no testimony that either of them contacted a

BOP employee, be it a correctional officer, a doctor, an orderly, or any other person to notify that

there was water in the cell.

Plaintiff stated that sometimes when inmates take showers water sprinkles on the floor, and

they do not have a mop or a towel.  But if that happens, inmates need to at least notify the BOP.

There was no testimony that anybody in plaintiff's cell informed the BOP that there was water on

the floor from the shower.  Plaintiff testified that there had been flooding in SHU, as well as pipes

bursting.  Even so, there is no evidence of BOP's knowledge of water in the floor of plaintiff's

cell.

BOP personnel walked down SHU at least seven times a day, and there is no indication

that anyone told them that the floor of plaintiff's cell was wet or slippery.  The only two people

that would know were plaintiff and his cellmate, and they failed to provide evidence that they

informed anybody of any such problem.  Maintenance records do not show flood on the day of the

alleged incident from plumbing or burst pipes.

Finally, plaintiff received medical treatment to the point where he has reached the

maximum medical improvement he could reach.  The court is not persuaded that plaintiff was

ignored.  Contemporaneous records indicate that health related complaints by inmates were acted

Arzuaga-Rivera v. United States of America
Civil No. 11-1827 (PAD)
Opinion and Order
Page 20

on.  Medical department personnel made daily rounds, and as described by its Director, they were

prepared to handle inmate health situations and emergencies.  Viewing the evidence as a whole,

plaintiff did not establish the elements needed to prevail in an action for damages under Articles

1802 and 1803 of the Puerto Rico Civil Code.  In consequence, the action is DISMISSED.

Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of March, 2017.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge